## AMERICAN CAN CO. v. HEDSTROM et al.

Circuit Court of Appeals, Seventh Circuit.
December 22, 1928.

No. 4033.

John C. Carpenter, of Chicago, Ill., for appellant.

Wm. F. Freudenreich, of Chicago, Ill., for appellees.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. December 10, 1925, appellant-plaintiff sued to compel conveyance to it of letters patent No. 1,518,791 (here called B) by G. W. Hedstrom, inventor, and Peter W. Fulford, assignee of a half interest therein. Hedstrom died and his widow Olga and Fulford are appellees (called defendants).

Hedstrom and Fulford, by written instrument dated April 5, 1924, assigned to appellant letters patent No. 1,472,417 (here called A), "together with the invention therein described, and all rights of action and claims thereunder existing at the date hereof." The instrument also contained the following: "Grantors further agree to execute upon request and without further consideration any and all application papers and assignments to the American Can Company upon improvements that have or may hereafter be made by said grantors upon the said Drying Machine in said letters patent, and particularly upon a certain improvement illustrated in a sketch dated November 27, 1922, signed by Gustav W. Hedstrom." Application for B was then pending but was not disclosed. B was issued December 9, 1924.

Plaintiff's contention is that B is an improvement within the terms of the assignment. Defendants contend that B is wholly different from A, and that they were only obligated to assign improvements upon the specific drying machine covered by A.

The bill was dismissed for want of equity.

Both A and B are inventions relating to ends used in making tin cans. A can end has its edge turned down and in, forming a groove into which a sealing compound is placed for sealing purposes when the ends are put onto the body of the can. The proper drying of that compound is difficult to ac-

complish, and there were various devices used unsuccessfully before Hedstrom entered the field, as inventor, to solve the problem. Two of the former machines and the reasons why they were not commercially successful are described, viz.: "One of these earlier constructions was the long box dryer having a chain traveling through an oven on which the can ends were fed flat, one behind the other. At times, can ends would overlap and the construction required considerable floor space, which rendered it almost impossible to operate satisfactorily commercially. Another construction * * * was the lifting of the can ends by two threaded posts vertically discharging the ends at the top, the ends falling down a chute and stacking up so that operators could pick them out of the chute. This type of dryer minimized drying time and caused excessive heat to be applied, blistering the lining compound."

It thus appears that one of the serious problems was to economize in floor space, over which the ends traveled on the endless chain, and yet retain a sufficient length of travel so that proper drying could be accomplished without the blistering temperature required when the threaded posts only were used.

Hedstrom, in A, undertook to solve that problem by housing the moving parts of his device in a cylindrical shell, into which the drying heat was introduced from the bottom. Below is the plan shown in Figure 3 of A:

Although A discloses three forms of invention, the first only will be sufficient for our purposes.

In Figure 3, 10 is the housing shell, around the inner side of which, but not shown, is a screw thread 11. 13 is an inner member, around the outer side of which, but not shown, is a screw thread 15. C is a can end, resting upon 11 and 15. It bridges the space between 10 and 13. To accommodate different sizes of ends, 13 is lifted out and a larger or smaller 13 is inserted, as required. 28 is a power pinion, that meshes with the teeth 27 on the large gear wheel or disk 20, not shown. 19 are posts set in the disk 20, and so positioned that they contact with the edges of the can ends at a point off their geometric center. 18 is a chute through which can ends are fed into the stacks at 17, not shown.

Through the coacting of these elements, 28 turns 27. 27 carries through the space between 10 and 13 the eight posts 19, which by contacting with the edges of the can ends, rotate the eight stacks of ends and move them through the screw threads, so that they pass around the inside of 10 and at the same time are moved up to the top of the dryer and of the threads, where they are discharged by a method not a part of A. By this, Hedstrom seems to have been the first to combine the elements of distance, time, and heat, so as to get the satisfactory commercial results through the use of the screw threads to obtain the upward and forward movement.

Below is Figure 4 of B, showing a transverse section of the device:

54 is the housing shell. 32 is the power pinion, that meshes with the teeth on the large gear wheel or disk 29. C are can ends resting upon and carried by the screw threads on two posts 10-10, attached to 29. 35 is an unthreaded post attached to 29 between and radially inside of the posts 10-10, and serves as a wall to keep the can ends from the screw threads. 15 is a divider-like device, by which the posts 10-10 may be moved together or apart, to carry different sizes of can ends. 85 (not shown) is an opening

in the housing shell, through which the can ends are fed into the machine over the guide ribs 86. 79 is a chute. Concerning the discharge of can ends into that chute, the specification says only: "Any suitable kick-off means may be employed for removing the can ends from the upper lifter shafts to cause them to slide into the chute 79."

Through the coacting of these elements, 32 turns 29, and carries the sixteen screwthreaded posts 10 and the eight stacks of can ends C around and inside of the housing shell 54. The connection between the posts 10 and 29 is such that the posts revolve in the same direction, but, as to the can ends between them, they revolve in opposite directions, thereby revolving the can ends as they are carried to the top of the machine and the threads, where they are discharged at 79. The drying heat is introduced from below.

Analyzing A and B, we find the following:

Of A in December, 1922, and of B, in December, 1923, Hedstrom said: "I * * * have invented certain new and useful improvements in drying machines."

The specification in A said: "This invention relates to improvements in drying machines * * * and is herein shown as designed more especially for drying the thin film of sealing medium, such as rubber compound, in the bottoms of the annular grooves of can ends, there placed for the purpose of sealing the joint between the can body and ends."

In B, it is said: "This invention relates to improvements in drying machines for drying the thin coatings of sealing compound on the flanges of can ends, there placed for the purpose of insuring the sealing of the joint between the can body and the can ends when the grooved ends are seamed over the body of the can."

In each: (1) The moving parts are placed upon and carried by a large gear wheel or disk, turned by power through a small pinion at the side; (2) heat is introduced from below; (3) there is a cylindrical housing shell; (4) identical can ends are illustrated, indicated by the letter C; (5) there are shown eight stacks of can ends; (6) can ends are fed in at a single opening at the bottom and come out in one place at the top end of the screw threads; (7) the time and distance elements and the use of moderate heat, necessary in practical commercial drying, are the same.

It is pointed out that the screw threaded posts 10 are not found in A; that the introduction of those posts enable the user of the B invention, by simple adjustments, to adapt the machine to the use of different sizes of can ends without going through the cumbersome process, as in A, of lifting out one size 13 and inserting another.

To the casual observer, this looks like a radical change from the machine in A. In fact, it is not so. 13, the member that makes one side of the so-called drying chamber in A, is for that purpose unimportant. The drying chamber would be there, and is in B, without the presence of 13. It is not urged that the drying chamber in A, because of the presence of 13, functions differently from the chamber in B. 13 is nothing more than an enlarged post 10, and does what one post 10 does. Each carries one side of the stack of can ends. Each prevents the stack from falling out of the screw thread carrying the other side.

What Hedstrom did was to: (1) Omit the screw thread 11 from the inside of the housing shell 10 in A; (2) put screw thread around post 19 in A, and call it post 10; (3) reduce the size of 13 in A, and move it to a position opposite the first post 10, so that the can ends were carried between the two. The post 35, in B, prevents the stack of can ends from falling from the carrying threads as 13, in A, keeps the stack of can ends from falling out of the screw threads 11. A series of gear wheels were introduced to synchronize the movement of the posts 10. The adjustment in B, to permit the use of different sized can ends, is made by the use of slots in the separated ends of the divider appliance. Whether those things amounted to invention, it is not necessary to decide. The use of the screw posts was old before Hedstrom, and such use was familiar to him.

We are of opinion that B is a mere improvement of A within the meaning of the assignment. It is not as wide a departure from A, as is the device described in the instrument of assignment as an improvement of A, viz., "and particularly upon a certain improvement illustrated in a sketch dated November 27, 1922." That sketch was delivered to plaintiff at the time the assignment of A was made to plaintiff. Plaintiff's witness Taylor testified, subject to the single objection that his testimony was incompetent against Hedstrom, who was dead, as to what was said prior to the execution of the assignment. It was brought out more clearly on his cross-examination that it was intended that all improvements on drying machines should be assigned and that the assignors, in response to a direct question, said that they had no other improvements relating to

drying machines. B was then pending in the Patent Office. When defendant Fulford was on the stand he was asked: "Q. Did Mr. Taylor or Mr. Breckenridge or any one on behalf of the American Can Company say to you at any time before the execution of the assignment of April 5, 1924, that you and Mr. Hedstrom were expected to turn over without further consideration to the American Can Company all improvements that you or Mr. Hedstrom might then have or might thereafter have in drying machines of any kind? A. I have no recollection of Mr. Taylor mentioning improvements at all until Mr. Hedstrom and myself mentioned to him that we had another application in the patent office on improvements on the first applications and that we had a sketch in our pockets showing the elongated machine, and Mr. Taylor looked over these sketches. That was all that I heard spoken about improvements. Those were the only improvements we had on the original Hedstrom machine." There is an intimation in this answer that something might have been said that the witness did not remember.

B was issued December 9, 1924. June 3, 1925, Hedstrom and Fulford made an agreement with the Seattle Astoria Iron Works, by which that concern was licensed to manufacture under B. It contained the following provision: "10. The Licensors covenant and agree with the Licensee that, in the event of an action brought against Licensors, charging that the Licensors do not now possess the legal and equitable title to the aforesaid Letters Patent, with the result that the title to said patent shall become vested in the party bringing such action, and in the further event that the vesting of the title in said patent shall obligate the Licensee to pay royalties, damages or profits to such third party on account of machines on which the Licensee shall have paid royalties to the Licensors, the Licensors will refund to the Licensee (each the amount of the royalties that have been received by him) the amount of the royalties that have been paid hereunder to them by the Licensee."

This suit was commenced December 10, 1925. A few days thereafter, in January, 1926, the same parties made another agreement, reciting the first agreement, the bringing of this suit, the control by the Seattle Astoria Iron Works of an application for a patent said to conflict with B, and then specified several things agreed to: (1) Clause 10, supra, was canceled; (2) royalty was changed; (3) if licensors were defeated in the suit, royalties should cease. One of the things inducing the making of that contract was the following: "Whereas the Licensors will be put to large expense in defending said suit and a probable interference proceeding between said Patent No. 1,518,791 and said application Serial No. 58,430, it is therefore the desire of the parties hereto to modify and enlarge the said Main Contract heretofore entered into by and between the parties hereto."

Whether the first agreement has any bearing upon the question depends upon whether it was made before or after Hedstrom and Fulford knew that the plaintiff was demanding from them the assignment of B. If it was made before, it would indicate that the parties had reason, because of the assignment and what was said at the making of it, to believe that the demand would be made. If made after the demand, the contract might not indicate more than the prudent desire to protect their interest. The second contract, and the fact appearing in the record that the interference was filed and determined against B, indicates an intention to destroy, as far as possible, by a collusive interference proceeding, whatever rights plaintiff had in B.

The decree is reversed, with direction to enter a decree in harmony herewith.